**AFFIRMED IN PART AND REVERSED AND RENDERED IN PART and Opinion Filed August 18, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00562-CV**

**SILVER STAR TITLE, L.L.C., D/B/A SENDERA COMPANY, Appellant**
**V.**
**MARQUIS WESTLAKE DEVELOPMENT, INC., CDAVIS INVESTMENTS, LTD., PINETRADA INTERESTS, LTD., WINGLAKE HOLDINGS, LTD., AND WESTLAKE TOWN HALL, LLC, Appellees**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-11010**

## MEMORANDUM OPINION

Before Justices Whitehill, Osborne, and Carlyle
Opinion by Justice Whitehill

A party breaches a contract if it fails to do something it promised to do. In this case, appellees successfully sued appellant for breach of contract. The pivotal question on appeal is whether any contract obliged appellant to return certain escrowed funds to appellees on demand, as appellees claim. We conclude that the contracts at issue did not impose that obligation, so we reverse and render a take nothing judgment against appellees. We also overrule appellant's complaint about

the jury's adverse finding on its counterclaim, and we affirm the trial court's take nothing judgment on that counterclaim.

## I. BACKGROUND

### A. Factual Allegations

The Purchasers' live pleading alleged these facts:

In April 2014, Marquis Acquisitions, Inc. contracted to buy certain land from Maguire Partners – Solana Land, L.P. (Seller). Appellant Sendera Title (the Title Company) agreed to:

> hold in escrow, earnest money tendered by [Marquis] in the amount of $250,000.00. [The Title Company] also agreed to otherwise serve as a neutral escrow agent and fiduciary in the subject transaction with regard to that delivery, and all other deliveries, adhering to and complying with [Purchasers'] delivery instructions and/or the agreements that [the Title Company] made with [Purchasers] regarding the same.

Marquis later assigned its contract rights to appellees (Purchasers).

In anticipation of closing, Purchasers delivered to the Title Company the $250,000 escrow deposit, just over $6 million in additional purchase price funds, and various transaction documents. (The charge used these defined terms, so we use them in this opinion: (i) Contract of Sale means the real estate sales contract at issue; (ii) Earnest Money means the $250,000 earnest money that the Contract of Sale required Purchasers to put up; and (iii) Escrowed Funds means the additional $6 million in purchase price funds that Purchasers deposited with the Title Company.)

–2–

However, Purchasers notified the Title company—pre-closing—to return to Purchasers the closing documents and funds that Purchasers had tendered as there would be no closing, and the closing did not occur.

## B.     The Interpleader Case

Trial evidence showed these facts:

The Title Company received $250,000 in Earnest Money.  Section 4 of the sales contract is captioned EARNEST MONEY and required Purchasers to deposit $250,000 with the Title Company.  That section four gave that deposit the defined term "Earnest Money."  (At no point did the sales contract expand that defined term to include any other funds deposited with the Title Company.)

Emails exchanged on Friday, July 25, 2014, indicated that the parties expected the transaction to close the next Monday, July 28.  At some point around this time, the Title Company received from Purchasers $6 million in additional purchase funds, the Escrowed Funds.

However, early Monday morning, Purchasers instructed the Title Company that it did not have funding authorization on the transaction.  Shortly thereafter, Purchasers instructed the Title Company to return all funds that Purchasers had wired, meaning (i) the $250,000 Earnest Money and (ii) the $6 million in additional purchase money funds.  The Title Company did not do so.

Instead, four days later, it filed an interpleader action against Seller and Marquis, the original purchaser in Tarrant County and deposited almost $6.3 million,

plus a box of documents, with the district clerk. Purchasers later intervened in that case.

On August 29, 2014, the interpleader judge signed an agreed order granting a joint motion to dismiss the interpleader and release the interpleader property. Seller received $250,000 of the funds. Purchasers received the documents and the rest of the funds.

The dismissal order also provided that:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this interpleader action and all of the interpleader-related claims asserted by the parties in the above-styled and number[ed] matter are hereby DISMISSED, and that Plaintiff-in-Interpleader Silver Star Title, LLC d/b/a Sendera Title is discharged under Rule 43, Tex. R. Civ. P. Such dismissal and discharge shall, in no manner whatsoever, discharge or dismiss, or prejudice or impair, the rights or ability of any Defendant or Intervenor to file or assert claims or causes of action against Silver Star Title, LLC d/b/a Sendera Title, if any, in any way related to the interpleader, including but not limited to Plaintiff's pre-interpleader conduct, all of which are reserved by the Defendants and Intervenors.

## C. Procedural History

About three weeks after the interpleader dismissal, Purchasers sued the Title Company and two individuals (the Title Company's owner and CEO Charles Brown and escrow officer Jeanie Acord) for fiduciary breach, contract breach, conspiracy, and aiding and abetting.

The Title Company counterclaimed for contract breach and promissory estoppel.

The claims against the individual defendants dropped out of the case, and remaining claims and counterclaims were tried to a jury.

The jury answered seven questions as follows:

1. The Title Company breached the Contract of Sale and Purchasers' subsequent escrow instruction letters.

2. Purchasers did not waive the Title Company's breaches.

3. The Title Company lawfully and in good faith retained and interpleaded the $250,000 earnest money. The Title Company did not lawfully and in good faith retain and interplead "Other Escrowed Funds" (with "Escrowed Funds" previously defined as "all funds other than the Earnest Money delivered to Sendera Title by [Purchasers]").

4. Purchasers' contract breach damages were: (i) $249,000 as the Purchasers' loss resulting from the Title Company's failure to return "the Earnest Money and/or Escrowed Funds" upon Purchasers' demand and (ii) $63,401 as the Purchasers' reasonable and necessary expenses incurred in attempting to recover those funds.

5. The Title Company breached its fiduciary duty to Purchasers.

6. Purchasers' fiduciary breach damages were $90,000, representing the Purchasers' monetary loss resulting from the Title Company's failure to return the funds upon demand. The jury also found that Purchasers' reasonable and necessary expenses in attempting to recover the funds were $0.

7. The Title Company did not incur any "costs, claims or expenses" in connection with performing its duties under the Contract of Sale relating to the Earnest Money or the Escrowed Funds.

Purchasers moved for judgment, and the Title Company moved for judgment notwithstanding the verdict and for new trial.

The trial judge signed a judgment that awarded Purchasers all the damages that the jury found, plus prejudgment interest.

The Title Company then moved for judgment notwithstanding the verdict, to modify or vacate, and for new trial. The trial judge signed an order that granted this motion in part, vacated the original judgment, and included the following language:

> The Courts finds there is insufficient evidence to support the Jury's award to Plaintiffs of $90,000.00 as a remedy for the breach of fiduciary duty the Jury found was committed by Defendant [the Title Company]; accordingly, and under the theory of election of remedies, it is ORDERED that Defendant's Motion to Vacate and for JNOV is GRANTED to the extent that this particular Jury awarded remedy and recovery shall be denied by the Court.

That same day, the judge signed a new final judgment awarding Purchasers only the contract breach damages found by the jury, plus prejudgment interest. The judgment also ordered the Title Company to take nothing on its counterclaims.

The Title Company filed a second motion for judgment notwithstanding the verdict and for new trial, which the trial judge denied. The Title Company then timely appealed.

## II. Issues

The Title Company's opening brief lists four issues presented, labeled A though D, and each issue has two or three sub-issues. We paraphrase the four overarching issues as follows:

> A. Did the trial court err by entering judgment for Purchasers on their contract breach claims?

–6–

B.      Did the trial court err by entering judgment for Purchasers for the contract breach damages found by the jury?

C.      Did the trial court err by failing to give proper effect to the interpleader judgment?

D.      Did the trial court err by denying judgment for the Title Company on its affirmative defenses and counterclaims?

## III.   ANALYSIS

### A.      Issue A:  Is the evidence legally insufficient to support the findings that the Title Company breached the contracts?

Yes.  We conclude that the contracts did not require the Title Company to return the Purchasers' purchase money of about $6 million on demand.  Accordingly, the evidence that the Title Company retained and then interpled that money is no evidence that the Title Company breached the contracts.[1]

### 1.      Standard of Review

When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must show that no evidence supports the finding.[2]  *Guillory v. Dietrich*, 598 S.W.3d 284, 293 (Tex. App.—Dallas 2020, pet. denied).  When evidence is so weak that it does no more than create a surmise or suspicion of the matter to be proved, the evidence is no more than a scintilla and, in legal effect, is no evidence.  *Id*.  Evidence is legally

---

[1] The Title Company preserved this argument in its second motion for judgment notwithstanding the verdict and for new trial, which the trial court denied.  *See Defterios v. Dallas Bayou Bend, Ltd.*, 350 S.W.3d 659, 664 (Tex. App.—Dallas 2011, pet. denied).

[2] The Title Company's brief is not clear whether it intends to assert an alternative factual sufficiency issue.  But our sustaining its no evidence issues regarding Purchasers' contract breach claims means we would not reach the Title Company's factual sufficiency issue if it were being asserted.

sufficient if it would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

In conducting our legal sufficiency review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id*. at 822. We must credit evidence favorable to the verdict if a reasonable person could, and we must disregard contrary evidence unless a reasonable person could not. *Id*. at 827.

We measure the sufficiency of the evidence against the court's jury charge if the challenging party didn't object to the charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, although the Title Company raises some complaints about the jury charge, they are not germane to our analysis; thus, we apply the *Osterberg* rule.

### 2. Applicable Law

The elements of a contract breach claim are (i) a valid contract, (ii) performance or tendered performance by the plaintiff, (iii) breach by the defendant, and (iv) damages sustained by the plaintiff as a result of that breach. *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 625 (Tex. App.—Dallas 2020, no pet.).

"A breach of contract occurs when a party fails to perform an act it has explicitly or impliedly promised to perform." *Gaspar v. Lawnpro, Inc.*, 372 S.W.3d 754, 757 (Tex. App.—Dallas 2012, no pet.).

When we interpret a contract, our goal is to ascertain the parties' intent as expressed in the instrument. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757 (Tex. 2018). "'[O]bjective, not subjective, intent controls,' so the focus is on the words the parties chose to memorialize their agreement." *Id*. (footnote omitted). "[O]ur quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Id*. at 764. "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

"Additionally, courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2006, pet. denied).

Whether a party has breached a contract is a legal question for the court, not a fact question for the jury, if the facts of the parties' conduct are undisputed or conclusively established. *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010).

### 3.    Applying the Law to the Facts

#### a.    The Jury Findings

We start with the jury charge. *See Osterberg*, 12 S.W.3d at 55.

This is Question 1, with the jury's "yes" answers:

Did Sendera Title fail to comply with its obligations under the Contract of Sale or the Escrow Agreement? Answer "Yes" or "No" for each of the following:

1.   Contract of Sale        <u>YES</u>

2.   Escrow Agreement        <u>YES</u>

The charge defined "Escrow Agreement" as plaintiffs' exhibit 4, which was one of four July 24, 2014 escrow instruction letters from Purchasers' lawyers to the Title Company. Escrow officer Jeanie Acord accepted those letters by signing them on July 25, 2014.

And, as discussed earlier, the jury charge defined "Contract of Sale" as plaintiffs' exhibit 1, which was the April 2014 real estate contract of sale signed by Seller, Purchasers' predecessor in interest, and the Title Company. Consistent with the Contract of Sale, the charge defined "Earnest Money" to mean the $250,000 that Purchasers delivered to the Title Company. Although the Contract of Sale does not use the term, the charge defined "Escrowed Funds" to mean all other funds that Purchasers delivered to the Title Company.

The contract damages question, Question 4, effectively limited the universe of relevant breaches to the Title Company's failure to return the Earnest Money and additional purchase funds to Purchasers on demand. Specifically, Question 4 submitted only the two following damages categories:

1.   The monetary loss sustained by [Purchasers] as a result of Sendera Title's failure to return the Earnest Money and/or Escrowed Funds at the time of [Purchasers'] demand.

–10–

[Answer:    $249,000.00]

2.    The reasonable and necessary expenses incurred by [Purchasers] in attempting to recover the Earnest Money and/or Escrowed Funds.

[Answer:    $63,401.00]

Thus, given the charge's defined terms, the retained and interpled closing documents are not at issue.[3]

### b.    The Evidence

In the Contract of Sale, Seller agreed to sell about 86 acres in the Town of Westlake to Purchasers' predecessor for about $17 million. The development plan for the land included Westlake's city hall, a shopping center, and housing.

Acord signed the Contract of Sale under a paragraph reciting, "The Title Company acknowledges receipt of this Contract on April 28, 2014 and agrees to accept the Earnest Money subject to the terms and conditions set forth in this Contract." Beneath Acord's signature, someone handwrote, "Received $250,000.$\underline{^{00}}$ earnest money," and Acord also signed for the Title Company under that notation. Hickok testified that his company supplied the $250,000.

The Contract of Sale includes the following provisions:

[§ 4.A.]    Earnest Money.  [This section required the purchaser to deposit $250,000 earnest money with the Title Company, of which

---

[3] Because we conclude that there is no evidence that the Title Company breached either contract, we need not address Seller's arguments that these questions violated the *Casteel* rule. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).

–11–

$1,000 was non-refundable and would be Seller's upon any termination of the Contract of Sale.]

[§ 4.B.]     . . . If Purchaser terminates this Contract on or prior to the expiration of the Inspection Period (hereinafter defined), all of the refundable portion of the Earnest Money shall be returned to Purchaser. If Purchaser does not terminate this Contract on or prior to the expiration of the Inspection Period, the Earnest Money shall be non-refundable to Purchaser unless this Contract is terminated pursuant to Sections 6, 10 or 13(B) hereof. If this Contract is terminated pursuant to any of Sections 6, 10 or 13(B) after the expiration of the Inspection Period, the refundable portion of the Earnest Money shall be returned to Purchaser. The Earnest Money shall be paid to Seller at the Closing and shall be applicable to the Purchase Price.

. . . .

12.   CLOSING.

. . . .

[§ 12.C.]   Purchaser's Closing Documents.   At the Closing, Purchaser shall deliver to Seller at Purchaser's expense:

    (1)    The Purchase Price . . . .

. . . .

13.   DEFAULT.

. . . .

[§ 13.A.]    (2)  Seller's Remedies.  If Purchaser fails to close this Contract for any reason except Seller's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Purchaser shall be in default and Seller may, as Seller's sole remedy, terminate this Contract, in which event, the Earnest Money shall be paid to Seller as liquidated damages for the Purchaser's breach of this Contract, and neither party shall have any further obligation hereunder except for the obligations that expressly survive the termination of this Contract.  In no event shall Purchaser be liable to Seller for any punitive, speculative, consequential, or other damages.

. . . .

–12–

16.    EARNEST MONEY PROVISIONS.

. . . .

[§ 16.B.]    Termination by Purchaser. If Purchaser elects to terminate this Contract pursuant to its rights under Sections 6 or 9 [entitled "Review of Title Documents" and "Inspection," respectively], Title Company shall pay the refundable portion of the Earnest Money to Purchaser two (2) business days following receipt of the termination notice under any such Section from Purchaser (as long as the current investment can be liquidated within one day) and this Contract shall thereupon terminate.  No notice to Title Company from Seller shall be required for the release of the Earnest Money to Purchaser by Title Company.  The Earnest Money shall be released and delivered to Purchaser from Title Company upon Title Company's receipt of Purchaser's termination notice, despite any objection or potential objection by Seller.  Seller agrees it shall have no right to bring any action against Title Company which would have the effect of delaying, preventing, or in any way interrupting Title Company's delivery of the Earnest Money to Purchaser pursuant to this Section, any remedy of Seller being against Purchaser, not Title Company.

[§ 16.C.]    Other Terminations.  Upon a termination of this Contract other than as described in Section 19(B)[4] above, either party (the "Terminating Party") shall give written notice to the Title Company and the other party (the "Non-Terminating Party") of such termination and the reason for such termination.  Such request shall also constitute a request for the release of the Earnest Money to the Terminating Party.  The Non-Terminating Party shall then have five (5) business days in which to object in writing to the release of the Earnest Money to the Terminating Party. If the Non-Terminating Party makes such an objection, the Title Company shall retain the Earnest Money until it receives either written instructions executed by both Seller and Purchaser as to the disposition of the Earnest Money, or a court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money to a particular party, in which event the Earnest Money

---

[4] There is no § 19(B); § 19 is a single, unlettered paragraph addressing offer and acceptance.  The Title Company suggests, and Purchasers do not dispute, that this is a scrivener's error.  The intended reference seems to be § 16.B, "Termination by Purchaser."

shall be delivered in accordance with such notice, instruction, order, decree or judgment.

[§ 16.D.]    Interpleader.  Seller and Purchaser agree that upon any controversy regarding the Earnest Money, unless mutual written instructions are received by the Title Company directing the Earnest Money's disposition. the Title Company may either await disposition of any proceeding relating to the Earnest Money or, at the Title Company's option, interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Title Company may recover all of its court costs and reasonable attorneys' fees. Seller or Purchaser, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Title Company.

[§ 16.E.]    Liability of Title Company. The parties acknowledge that the Title Company is acting solely as a stakeholder at their request and for their convenience, that the Title Company shall not be deemed to be the agent of either of the parties, and that the Title Company shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Contract, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Seller or Purchaser resulting from the Title Company's mistake of law respecting the Title Company's scope or nature of its duties.  Seller and Purchaser shall jointly and severally indemnify and hold the Title Company harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Title Company's duties hereunder, except with respect to actions or omissions taken or made by the Title Company in bad faith, in disregard of this Contract or involving negligence on the part of the Title Company.

On Monday, July 21, 2014, the town of Westlake adopted a resolution approving the assignment of development agreements regarding the land from Seller to one of the Purchasers, Marquis Westlake Development, Inc.  Hickok testified that he controlled all five Purchasers and believed Marquis Westlake Development, Inc. was the "lead company" of the Purchasers.

–14–

On Thursday, July 24, four of the Purchasers sent letters to the Title Company that listed the closing documents Purchasers would be delivering and contained detailed instructions to the Title Company about their handling. That same day, Purchasers' lender, PlainsCapital Bank, sent four similar letters to the Title Company.

On Friday, July 25, on the Title Company's behalf, Acord signed each Purchaser letter under the words "agreed to and accepted." The Title Company received Purchasers' documents, about $6 million in funds from Purchasers, and about $11 million in funds that Purchasers were borrowing from PlainsCapital Bank.

But that same day, Hickok talked to Jeff Blackard, one of his partners who had "really conceived this whole development" but was not putting any money into the transaction. Hickok and Blackard had a disagreement about who was going to "control this deal," and Hickok thought that he probably didn't want to partner with Blackard. Hickok decided he would use the weekend to think through how to do the deal. Purchasers' lawyer, Hap Stern, also testified that there were still some unresolved issues in the closing process at the end of July 25. Nevertheless, the transaction parties exchanged emails at the end of the day suggesting that the transaction was "ready to go."

On Monday morning, July 28, Stern learned from Purchasers that there was a problem and they were going to postpone the closing. He called Acord and told her that Purchasers were going to request that everything be returned. At 8:51 a.m.,

Stern sent Acord an email seeking to confirm their conversation that the Title Company did not have funding authorization on the transaction. At 9:01, Acord sent a confirmation email. At 9:13, Stern sent Acord an email that said, "[W]e hereby authorize and instruct you to return all funds wired by the Purchasers' [sic] to Purchasers in accordance with the following wiring instructions: [account information followed.] Please confirm receipt of this instruction and when the wire has been initiated (with the Federal Reference Number) when available." At 9:21, Acord replied, "OK."

At some point on July 28, the Title Company's owner and CEO Charles Brown, who was out of town, learned about the problem with the transaction. He testified that he called Seller before it made any claim to the escrowed funds. Later that day Seller sent the Title Company and Hickok a letter saying that Seller claimed all $17 million in the Title Company's possession. But later that day Seller and Purchasers consented to the Title Company's returning the $11 million loaned by PlainsCapital Bank, and it did so.

Four days later, the Title Company filed its interpleader action and deposited the documents and almost $6.3 million with the district clerk.

On August 29, 2014, the interpleader judge signed an agreed order disposing of the suit. Seller received $250,000 of the funds. Purchasers received the rest of the funds and the documents.

### c. Is there any evidence that the Title Company breached the Contract of Sale by retaining and interpleading Purchasers' $6 million in purchase funds despite Purchasers' demand?

No, the Contract of Sale did not require the Title Company to immediately return purchase funds it subsequently received from Purchasers upon Purchasers' demand, nor did it prohibit the Title Company from interpleading those funds.

### 1. General Discussion

At the outset, we note that the jury found in answer to Question 3 that the Title Company lawfully and in good faith retained and interpled the $250,000 earnest money. As Purchasers' counsel agreed at oral argument, this negated the jury's Question 1 contract breach findings as to the Title Company's retaining and interpleading the earnest money. *See Clayton v. Mony Life Ins. Co. of Am.*, 284 S.W.3d 398, 401 (Tex. App.—Beaumont 2009, no pet.) (interpleader relieves stakeholder of potential liability to pay out single fund more than once); *Petro Source Partners, Ltd. v. 3-B Rattlesnake Ref. (1990), Ltd.*, 905 S.W.2d 371, 374–78 (Tex. App.—El Paso 1995, writ denied) (treating proper interpleader as defense to claims brought in separate lawsuit). Thus, the only question is whether the Title Company's retaining and interpleading Purchasers' additional $6 million of purchase funds breached the Contract of Sale or Purchasers' subsequent escrow instruction letters.

The Title Company argues that its retaining and interpleading the purchase funds did not breach the Contract of Sale because the contract doesn't contemplate

that the Title Company would receive the purchase money before closing and therefore is silent regarding the Title Company's duties regarding that money. As the Title Company correctly states, the Contract of Sale doesn't say that the Title Company will receive the purchase price; rather, § 12(C)(1) states that "[a]t the Closing, Purchaser shall deliver to Seller at Purchaser's expense . . . The Purchase Price."[5] Thus, the Title Company concludes, the Contract of Sale imposed no duty on the Title Company to return the purchase funds on Purchasers' demand or not to interplead them later.

### 2. Sections 13(A)(2) and 16(D)

Purchasers argue that Contract of Sale §§ 13(A)(2) and 16(D) limited the Seller's remedies and the Title Company's interpleader rights and, thus, obliged the Title Company to return the purchase funds to Purchasers on demand.

We disagree with Purchasers' argument. Sections 13(A)(2) and 16(D) don't mention the $6 million in additional Escrowed Funds, much less require the Title Company to return them to Purchasers on demand.

Section 13(A)(2) provides that if Purchasers fail to close the Contract for any reason except Seller's default or a permitted termination, Seller's sole remedy will

---

[5] Purchasers assert that § 12 contemplated an escrow delivery of the additional purchase price funds because § 12(C) is entitled "Purchaser's Closing Documents" and lists "The Purchase Price" as one of the things "Purchaser shall deliver to Seller at Purchaser's expense" at closing. But § 12 doesn't mention escrow or say that any of "Purchaser's Closing Documents" will be delivered to the Title Company, and § 12(C) expressly says that Purchaser shall deliver the listed items "to Seller" at closing. So, we reject Purchasers' assertion.

be to terminate the Contract and receive the earnest money. Section 16(D) provides that if a "controversy regarding the Earnest Money" arises, the Title Company has the right to await the disposition of any proceeding relating to the earnest money or to file an interpleader over the earnest money. Neither provision mentions purchase funds beyond the earnest money, requires the Title Company to return such purchase funds on demand, or forbids the Title Company from interpleading such funds. Although § 16(D) expressly allows the Title Company to interplead the Earnest Money—which was all it received when it agreed to the Contract of Sale—it did not forbid the Title Company from retaining or interpleading any additional funds it received in the future. Indeed, the $6 million in additional Escrowed Funds are not mentioned in and are not within the Contract of Sale's scope. Stated differently, the Contract of Sale by its terms does not govern the additional $6 million Escrowed Funds.

Because the Contract of Sale doesn't impose any duties on the Title Company regarding Purchasers' purchase funds, or even hint that any such duties exist, we don't read §§ 13(A)(2)'s and 16(D)'s silence on the subject to imply a Title Company duty to return those funds on demand. We conclude that §§ 13(A)(2) and 16(D) do not require the Title Company to return Purchasers' $6 million in additional purchase funds, the Escrowed Funds, on demand or prohibit the Title Company from interpleading those funds. Consequently, the evidence that the Title

Company retained and interpled those funds is no evidence it breached §§ 13(A)(2) or 16(D).

### 3. Section 16(E)

Purchasers also rely on Contract of Sale § 16(E), "Liability of Title Company." We quote the key passage, with bracketed numbering added for convenience: "[T]he Title Company [i] shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Contract, but [ii] shall be liable [a] for its negligent acts and [b] for any loss, cost or expense incurred by Seller or Purchaser resulting from the Title Company's mistake of law respecting the Title Company's scope or nature of its duties."

First, we consider clause [i]. Purchasers argue that the Title Company breached clause [i] because there was evidence that the Title Company's CEO Charles Brown either "failed to regard the Contract" or "disregarded the same." But this misconstrues clause [i] as imposing a duty on the Title Company when the clause's plain language actually limits the Title Company's liability with a "good faith, and not in disregard of this Contract" defense. Clause [i] doesn't suggest that a Title Company act or omission that doesn't breach any other contract provision somehow becomes a breach merely because the act or omission isn't "in good faith" or the Title Company somehow "disregard[s]" the Contract without actually breaching it. Thus, any evidence that Brown did not consult or consider the Contract

–20–

of Sale's terms in deciding what to do with Purchasers' purchase money is no evidence of a contract breach.

Second, we consider clause [ii]. Purchasers don't argue that there's any evidence the Title Company acted negligently, so we dispense with clause [ii][a]. But Purchasers do assert that there was evidence to support a breach finding under clause [ii][b]—that Brown made a mistake of law by not returning Purchasers' additional purchase money on demand. However, they don't explain why Brown's decision not to return the additional purchase money on demand was a mistake of law. We have already concluded that the Title Company's retaining and interpleading that money didn't breach any other Contract of Sale duty.

Similarly, we conclude in the following section that there is legally insufficient evidence of an escrow instruction letter breach that might constitute an applicable mistake of law.

For these reasons, we conclude that the evidence is legally insufficient to support the jury's finding that the Title Company breached the Contract of Sale by retaining and interpleading the $6 million in purchase funds.

**d.** **Is there any evidence that the Title Company breached the escrow instruction letters by retaining and interpleading Purchasers' $6 million in additional purchase funds despite Purchasers' demand?**

No, the escrow instruction letters did not require the Title Company to return Purchasers' purchase funds on demand or forbid the Title Company from interpleading them.

The jury charge asked whether the Title Company breached one specific escrow instruction letter, the one sent on behalf of Purchaser CDavis Investments, Ltd. and admitted at trial as plaintiff's exhibit 4, so we will refer to the escrow instruction letters as "PX4" in our analysis.

The Title Company argues that PX4 neither (i) requires the Title Company to return the additional purchase funds on demand nor (ii) prohibits the Title Company from interpleading those funds in the event of a dispute.

The Title Company's argument is persuasive. We quote PX4's relevant passages, noting that the term "Borrower" refers to the particular Purchaser involved, CDavis Investments:

> We [attorneys for CDavis Investments] are delivering original execution counterparts of the following documents and instruments (collectively, the "Closing Documents"), which are to be held by you in strict accordance with the provisions of this escrow letter . . . :
>
> [list of 21 documents, such as various agreements, certifications, and disclosures].
>
> . . . All of the foregoing documents and instruments are hereinafter collectively referred to as the "Closing Documents."

–22–

> At any time prior to the actual consummation and funding of the Closing, Borrower and this firm reserve the right to withdraw the Closing Documents without further obligation to any party hereunder, and by your execution hereof, you hereby agree to immediately return same to the undersigned upon such instruction. Absent any such withdrawal instructions or any amendment hereto, you are hereby instructed to hold the Closing Documents in escrow until the following events have occurred:
>
> . . . .
>
> C.    You have received from Borrower the following: (i) the Borrower's Statement (herein so called), executed by Borrower and your company (which may be delivered via fax or email), and (ii) good funds (the "Funds") . . . in accordance with the amount(s) set forth on the Borrower's Statement.

We agree with the Title Company that under PX4 the Purchasers' purchase funds are not "Closing Documents" that the Title Company "agree[d] to immediately return" upon request. Specifically, PX4 defines "Closing Documents" as twenty-one specific documents, and the purchase funds are not among them.

Moreover, PX4 refers to the purchase funds later and defines them as "Funds." PX4 confirms the distinction between the Closing Documents and the Funds in a later paragraph beginning, "Your disbursement or recordation of the Closing Documents *or* your disbursement of the Funds will signify your agreement with Borrower and our firm that . . . ." (Emphasis added.)

Purchasers argue, and the Title Company concedes, that the Contract of Sale defines "Purchaser's Closing Documents" as including the purchase price of over $17 million. But we agree with the Title Company that that definition does not govern PX4's interpretation, for two reasons.

–23–

First, as explained above, PX4 contains its own different definition of "Closing Documents." PX4 specifically defines "Closing Documents" as used in that document as "[a]ll of the foregoing documents and instruments," and the foregoing list does not include the additional purchase money. Moreover, PX4 subsequently defines the money the Title Company will receive from the Purchaser and its Lender as the "Funds." For purposes of PX4, then, "Closing Documents" does not include the purchase money.

Second, PX4 doesn't actually use the Contract of Sale's term that Purchasers rely on—"Purchaser's Closing Documents." Rather, PX4 defines and uses the term "Closing Documents." And in PX4, the Title Company promised to "immediately return" the Closing Documents—not Purchaser's Closing Documents. Parties are free to define contract terms as they please, and courts will use those definitions in effectuating the parties' agreement. *See TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("A term's common-law meaning will not override the definition given to a contractual term by the contracting parties.").

Here, the PX4 parties agreed that "Closing Documents" did not include Purchasers' purchase money, so the Title Company's promise to return the Closing Documents immediately on demand was not a promise to return the $6 million on demand. Thus, we conclude that PX4 did not require the Title Company to return the purchase funds to Purchasers on demand.

–24–

It also does not mention interpleader, much less forbid the Title Company from interpleading the purchase funds.

Accordingly, we conclude that there is legally insufficient evidence that the Title Company breached PX4.

### e. Does the jury's fiduciary breach finding supply an independent basis for affirming the judgment?

Purchasers argue that we can affirm the judgment because the Title Company doesn't challenge the jury's fiduciary breach finding. According to Purchasers, the evidence supporting the fiduciary breach finding also supports a finding that the Title Company breached contract obligations that involved the performance of those fiduciary duties.

The Title Company responds that Purchasers' argument fails because the trial court ruled that there was no evidence to support the jury's fiduciary breach damages finding and Purchasers have not challenged that ruling on appeal. They also argue that a fiduciary breach finding will not support a contract breach remedy.

We reject Purchasers' argument. The Title Company is correct that the trial court ruled that there was no evidence to support the jury's $90,000 finding for fiduciary breach damages.[6] Purchasers have not challenged that ruling on appeal.

---

[6] The trial court's order granted the Title Company judgment notwithstanding the verdict on Purchasers' fiduciary breach claim for two reasons: insufficient damages evidence and the election of remedies doctrine.

Moreover, we agree with the Title Company that Purchasers cannot connect the fiduciary breach finding with the contract breach damages findings. The jury charge did not connect them; rather, it expressly limited the contract breach damages to those damages resulting from the breach or breaches the jury found in answer to Question 1 (the contract breach liability question).

Additionally, the fiduciary breach question, Question 5, did not reference any contract breach or require the jury to find a contract breach to find a fiduciary breach. Rather, Question 5 instructed the jury to find a fiduciary breach if the Title Company "failed to exercise a high degree of care to conserve the Earnest Money and Escrowed Funds and pay it only to those entitled to receive it" or "failed to act in the utmost good faith or exercise the most scrupulous honesty towards" Purchasers. Thus, the jury charge affords no basis for concluding that the Title Company's fiduciary breach or breaches were also contract breaches.

We reject Purchasers' argument that the fiduciary breach finding provides a basis for affirming their contract breach judgment.

### 4. Conclusion

We hold that (i) the jury's answer to Question 3 gave the Title Company an interpleader defense regarding its retaining and interpleading the $250,000 Earnest Money and (ii) the Title Company's retaining and interpleading Purchasers' $6 million in additional purchase funds did not breach either the Contract of Sale or the escrow instruction letters. Accordingly, we sustain Issue A's legal sufficiency

–26–

challenge, which makes it unnecessary for us to address the remaining arguments under Issue A. We also need not address Issues B and C.

**B.    Issue D:  Is the jury's failure to find that the Title Company incurred expenses related to performing its Contract of Sale duties supported by insufficient evidence?**

Our disposition of Issue A means that the only part of Issue D we need to address is the argument regarding the Title Company's counterclaim. Specifically, the Title Company makes a sufficiency challenge to the jury's "no" answer to Question 7, which asked—

> Did Sendera Title incur any costs, claims or expenses, including reasonable attorneys' fees, in connection with the performance of its duties under the Contract of Sale that related to the Earnest Money and/or the Escrowed Funds?

The Title Company preserved this argument in its second motion for judgment notwithstanding the verdict or new trial. The standard of review is whether the evidence established a "yes" answer as a matter of law (legal sufficiency) or the "no" answer is against the great weight and preponderance of the evidence (factual sufficiency). *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241–42 (Tex. 2001) (per curiam).

We reject the Title Company's argument. Its brief's entire discussion of the evidence consists of (i) two references to Contract of Sale provisions purportedly entitling the Title Company to recover its fees and expenses from Purchasers and (ii)

the assertion, "Sendera sought those fees," supported by two reporter's record references.

The first record reference is to a passage of Brown's testimony in which he described the course of the interpleader lawsuit. At the end of that passage, counsel asked Brown if he was asking the jury for his expenses and reasonable attorney's fees "incurred in the connection and the performance of your duties and in the defense of this case," and Brown answered, "Yes, sir."

The second record reference is to a stipulation reached out of the jury's presence that the Title Company's reasonable and necessary attorney's fees in *this* lawsuit were $125,000 in the trial court through trial, with additional amounts in the event of appeal. But the jury charge asked whether the Title Company incurred expenses "in connection with the performance of its duties under the Contract of Sale." Assuming the jury knew of the stipulation, the Title Company has not shown that the jury acted unreasonably by rejecting the Title Company's position that its current litigation fees were sufficiently connected with the Title Company's performance of its Contract of Sale duties.

In sum, we conclude that the Title Company has not shown that the jury's answer to Question 7 was either contrary to conclusive proof or against the great weight and preponderance of the evidence. Thus, the trial court did not err by denying the Title Company's second motion for judgment notwithstanding the

verdict and new trial regarding the jury's answer to Question 7. To that extent, we overrule Issue D.

## IV. DISPOSITION

We reverse the trial court's judgment to the extent it awards relief to Purchasers on their claims, and we render judgment that Purchasers take nothing on their claims. In all other respects, we affirm the trial court's judgment.


/Bill Whitehill/
BILL WHITEHILL
JUSTICE

190562F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

SILVER STAR TITLE, L.L.C., D/B/A SENDERA TITLE, Appellant

No. 05-19-00562-CV    V.

MARQUIS WESTLAKE DEVELOPMENT, INC., CDAVIS INVESTMENTS, LTD., PINETRADA INTERESTS, LTD., WINGLAKE HOLDINGS, LTD., AND WESTLAKE TOWN HALL, LLC, Appellees

On Appeal from the 95th District Court, Dallas County, Texas Trial Court Cause No. DC-14-11010. Opinion delivered by Justice Whitehill. Justices Osborne and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED AND RENDERED** in part. We **REVERSE** the trial court's judgment to the extent it awards monetary relief to appellees Marquis Westlake Development, Inc., CDavis Investments, Ltd., Pinetrada Interests, Ltd., Winglake Holdings, Ltd., and Westlake Town Hall, LLC, and we **RENDER** judgment that appellees Marquis Westlake Development, Inc., CDavis Investments, Ltd., Pinetrada Interests, Ltd., Winglake Holdings, Ltd., and Westlake Town Hall, LLC take nothing from appellant Silver Star Title, L.L.C., D/B/A Sendera Title. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellant Silver Star Title, L.L.C., D/B/A Sendera Title recover its costs of this appeal from appellees Marquis Westlake Development, Inc., CDavis Investments, Ltd., Pinetrada Interests, Ltd., Winglake Holdings, Ltd., and Westlake Town Hall, LLC. The obligations of Great American

Insurance Company as surety on appellant's supersedeas bond are **DISCHARGED**.

Judgment entered August 18, 2020.